**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARIA IRENE ROMAN CARABALLO,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   21-cv-1810** |
| | : | |
| **KILOLO KIJAKAZI,[1]** | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

<u>**MEMORANDUM OPINION**</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                              **October 27, 2022**

Plaintiff Maria Irene Roman Caraballo brought this action seeking review of the Acting Commissioner of Social Security Administration's decision denying her claim for Social Security Disability Insurance (SSDI) benefits and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–433, 1381–1383f.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 10) is **DENIED**.

## I.      PROCEDURAL HISTORY

Plaintiff protectively filed for SSDI and SSI, alleging disability since November 20, 2015, due to depression, anger, rheumatoid arthritis (in knees, ankles and feet), thyroid problems, back problems, hypothyroidism, high blood pressure, and anxiety.  (R. 221).  Plaintiff's applications were denied at the initial level, and Plaintiff requested a hearing before an

---

[1]  Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi has been substituted for Andrew Saul as the Defendant in this case.

Administrative Law Judge (ALJ).  (R. 107-08, 131-33).  Plaintiff, represented by counsel, and a vocational expert testified at the October 24, 2018 administrative hearing.  (R. 39-74).  At the hearing, Plaintiff amended her alleged disability onset date to September 6, 2017, her fiftieth birthday.[2]  (R. 45).  On January 8, 2019, the ALJ issued a decision unfavorable to Plaintiff.  (R. 17-38).  Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on April 13, 2020, thus making the ALJ's decision the final decision of the Acting Commissioner for purposes of judicial review.  (R. 1-6).

On April 19, 2021, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania.  (Compl., ECF No. 1).  On April 20, 2021, Plaintiff consented to my jurisdiction pursuant to 28 U.S.C. § 636(C). (Consent Order, ECF No. 4).  On November 11, 2021, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 10).  On December 13, 2021, the Acting Commissioner filed a Response.  (Resp., ECF No. 11).

## II.    FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on September 6, 1967, and was 50 years old on the alleged disability onset date.  (R. 75).  She obtained a GED.  (R. 222).  Plaintiff previously worked as a baker, a cashier in a grocery store, a cashier and coffee maker in a donut shop, and a cook in a fast food restaurant.  (R. 223).

---

[2]  In making the amendment, Plaintiff's counsel inadvertently referenced her birthday as September 5.  (R. 45; *see also* R. 75).

A.     **Medical Evidence**[3]

Plaintiff presented to rheumatologist Susan Lee, M.D., of Coordinated Health in Easton, Pennsylvania, on February 10, 2017, with complaints of lower back pain and bilateral knee and foot pain.  (R. 407).  She described her pain as three on a one-to-ten scale (left knee), achy, dull, intermittent and stable, although she also stated that "she feels she is doing worse."  (R. 409).  Plaintiff's height was five feet seven and one-half inches and her weight was 310 pounds.  (R. 407).  Dr. Lee diagnosed Plaintiff with lumbago and chronic joint pain primarily in her knees and feet, gave her steroid injections in her knees, prescribed Tizanidine, and recommended weight loss.  (R. 410-11).  X-rays of Plaintiff's feet showed heel spurs, an insertional Achilles enthesophyte, joint space narrowing in the knees with arthrosis and generally mild multilevel degenerative disc disease.  (R. 420-22).  At subsequent monthly visits in March and April 2017, Plaintiff further complained of left thigh numbness and tingling suspected to be radiating from her lower back; Dr. Lee recommended Ibuprofen.  (R. 401, 405).  However, at all three visits, Plaintiff was noted to have a normal gait and range of motion with full strength in her arms and legs. (R. 399-400, 404-05, 409).

On March 1, 2017, Plaintiff underwent a sleep study at Easton Hospital.  (R. 456-57).  At a follow up visit with Gerald Lowman, M.D., he diagnosed Plaintiff with obstructive sleep apnea syndrome and indicated that she would likely benefit from a CPAP, which he

_____

[3]  Plaintiff's Request for Review does not concern the ALJ's findings regarding her high blood pressure, thyroid problems, sleep apnea or mental health problems.  Accordingly, the Court will not address these conditions at this time, except as they relate to Plaintiff's impairments at issue.

ordered for her.  (R. 454).  Upon examination, Plaintiff was noted to have normal psychiatric results, gait and station.  (*Id.*).

On May 8, 2017, State agency medical consultant Angela Walker, M.D., opined that Plaintiff could frequently lift and carry 10 pounds and occasionally lift and carry 20 pounds. She found that Plaintiff could not climb ladders, ropes or scaffolds but that she could occasionally balance and frequently engage in other postural maneuvers.  (R. 83).  She further determined that Plaintiff must avoid concentrated exposure to extreme temperatures, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and workplace hazards.  (R. 84).  She also concluded that Plaintiff could stand and walk or sit for six hours in a workday.  (R. 83).

A June 27, 2017 x-ray of the lumbar spine showed mild degenerative disc change at the L1-L2 disc with marginal spurs throughout the lumbar spine, but without compression deformity, spondylolysis or acute fractures.  (R. 786).  An August 14, 2017 x-ray of the left knee showed mild osteoarthritis of the lateral primary joint with mild to moderate osteoarthritis in the femoral patellar joint.  (R. 785).

On March 5, 2018, Plaintiff presented to the Temple University Hospital Emergency Department in Philadelphia, Pennsylvania, with pain and swelling in her left leg and was diagnosed with cellulitis, a skin infection.  (R. 712).  She reported some pain with ambulation but had a normal gait and range of motion.  (R. 715-16).  Plaintiff was prescribed doxycycline.  (R. 716).

On April 4, 2018, Plaintiff presented to Emi Okamoto, M.D., at Delaware Valley Community Health for abdominal pain and a medication refill, with additional complaints of a skin infection on her left leg, bloating, and ear, leg, and back pain.  (R. 771).  Dr. Okamoto

referred Plaintiff back to her rheumatologist for a refill of her methotrexate pending another appointment with the rheumatologist.  (R. 774).  Plaintiff returned to Dr. Okamoto on April 25, 2018 visit for hypertension and epigastric, on May 3, 2018 for a cold, and again on June 14, 2018, for abdominal pain.  (R. 753, 759, 766).  Musculoskeletal examination results were normal at all four visits.  (R. 755, 762, 766, 769, 773).

On May 15, 2018, Plaintiff presented to Chantel Park, M.D., a rheumatologist with Jefferson Health in Philadelphia.  (R. 805).  Plaintiff reported stiffness in her lower back, knees, ankles and feet lasting for 10 to 15 minutes in the morning, and feet and ankle swelling.  (*Id.*).  Dr. Park observed that Plaintiff had class III obesity, and electromyography confirmed left lumbar radiculopathy. (T. 505).  A physical examination revealed an antalgic gate and some joint tenderness, but Dr. Park noted that Plaintiff's rheumatoid arthritis was "well-controlled" overall with full range of motion.  (R. 805, 811).  Plaintiff reported "some relief" and "significant improvement" with prior use of methotrexate and Euflexxa, respectively, and Dr. Park noted that the former would be restarted pending laboratory results.  (R. 805).  Plaintiff returned to Dr. Park on June 19, 2018, and reported that she felt the same with weekly use of methotrexate since her last visit, although she denied any swelling.  (R. 844).  She further reported difficulty sticking to the diet recommended by her nutritionist and failure to wear a prescribed ankle brace. (*Id.*).  Her physical examination results were similar to those from the prior visit.  (R. 846). Dr. Park planned to increase her methotrexate dosage pending laboratory results.  (R. 849). At Plaintiff's August 14, 2018 visit, it was noted that she had not yet scheduled a prior referral for epidural injections.  (R. 874).  Her physical examination results again tracked

those from the prior visits.  (R. 876).  Dr. Park referred Plaintiff to aquatherapy and ordered a medial unloader brace for her knee.  (R. 880).

Plaintiff presented to Einstein Orthopedics on May 30, 2018, with worsening bilateral foot and ankle pain, especially on the left side, described as aching, painful to the touch, and severe but fluctuating.  (R. 787).  Gait disturbance and swelling were also noted.  (R. 788).  X-rays showed bilateral bunions with minimal osteophyte formation.  (*Id.*).  She was diagnosed with ankle weakness, bilateral pes planus and obesity and prescribed an ankle brace, and orthotics were discussed.  (R. 789).  Physical therapy, which was noted to have helped previously, was also recommended.  (*Id.*).  It was further noted that Dr. Okamoto had diagnosed her with flat feet deformity.  (*Id.*).  Plaintiff returned on July 9, 2018, for lower back pain, at which time an x-ray showed degenerative joint disease.  (R. 791).  Plaintiff indicated she was having no leg pain at that time, and Shelley Blakely, PA-C, noted that she had full strength in her lower extremities.  (R. 790).  Ms. Blakely referred Plaintiff for an MRI, counseled her on weight loss and indicated that she should return on an as-needed basis.  (*Id.*).

Plaintiff met with registered dietitian Eric Galuchie of Jefferson Health on June 6, 2018.  (R. 944).  At the visit, Plaintiff weighed 315 pounds and had a body mass index of 47.9.  (*Id.*).  She reported having previously lost 20 pounds but that she regained it because she "ha[d] gotten into her old habits of sitting around the house and not getting up to walk." (*Id.*).  Plaintiff stated that she was "very interested" in walking more again and that pain was her primary motivation for losing weight.  (R. 944-45).

Plaintiff underwent a physical therapy evaluation and began physical therapy at Jefferson Health on June 4, 2018.  (R. 509).  She reported bilateral knee and ankle pain and lower back pain, rated at five out of 10 at the time and at its most severe, but which was

6

relieved by lying on her back side.  (*Id.*).  She told the physical therapist, Joseph A.

McCoy, that she could sit or stand for only 30 minutes due to back pain, that she could

walk two to three city blocks, that she must take one step at a time and use a railing while

climbing stairs, that her pain awakened her three to four times per night, and that she had

pain while carrying groceries and laundry.  (R. 510).  Mr. McCoy noted an altered gait and

decreased strength, range of motion, endurance, mobility and balance.  (R. 512).  He also

observed "lumbar derangement with flexion bias with gross lower extremity sensory

changes not a particular dermatome underlying hit/pelvic weakness leading to abnormal

joint loading responses with special testing consistent for bilateral hip osteoarthritis."  (*Id.*).

On the Oswestry Low Back test, Plaintiff scored 76%, qualifying her as

"crippled . . . . Back pain impinges on all aspects of the patient's life."  (R. 511, 514-15).

At a June 13, 2018 session, she reported increased pain due to having done "a bunch of

housework."  (R. 574).  Plaintiff attended a total of eight physical therapy sessions over the

next six weeks.  (R. 673).  Upon discharge, she reported unchanged lower back pain,

although her Oswestry score improved 28 percent, which was "indic[a]tive of increase[d]

function with decrease[d] [lower back pain . . . ."  (R. 673).  Plaintiff was counseled on the

importance of continuing her home exercise program and her recumbent cycling at the

YMCA.  (*Id.*).  She was also advised to follow up with her gastroenterologist regarding

possible bariatric surgery.  (*Id.*).

On August 1, 2018, Dr. Okamoto completed a Treating Source Statement – Physical

Conditions for Plaintiff.  (R. 696-99).  In the form, she noted that she had been treating

Plaintiff monthly since April 2018.  (R. 696).  Dr. Okamoto checked boxes indicating that

Plaintiff could maintain concentration for less than 30 minutes, would likely be off-task one-

quarter of the workday due to her symptoms, would likely miss four days of work per month due to her impairments and treatment, could occasionally lift and carry less than 10 pounds, could rarely lift and carry 10 to 20 pounds, could sit for less than one hour in a workday, and could stand and walk for four hours in a workday.  (R. 695-97).  Dr. Okamoto noted that Plaintiff would have to lie down twice per workday for 20 to 30 minutes but that she does not require a cane to ambulate.  (R. 697).  In addition, Dr. Okamoto checked boxes indicating that Plaintiff could occasionally reach overhead with her right arm and hand, but frequently do so with her left arm and hand, and that she could frequently reach in all directions, handle, finger, feel, push and pull, and operate foot controls bilaterally.  (R. 698). Moreover, Dr. Okamoto indicated that Plaintiff could never climb ladders or scaffolds or tolerate exposure to unprotected heights and moving mechanical parts; rarely climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; occasionally operate a vehicle and tolerate exposure to humidity and wetness, extreme temperatures, vibrations, and dusts, odors, fumes, and pulmonary irritants; and continuously rotate her head and neck.  (R. 699).

On August 9, 2018, cardiologist J. David Ogilby, M.D., of Jefferson Health evaluated Plaintiff for preoperative clearance for bariatric surgery.  (R. 985).  She weighed 306 pounds, which translated to a body mass index of 46.5.  (*Id.*).  Bilateral knee and foot pain were noted.  (R. 987).  Pre-surgical testing revealed anterior infarct, inferior ischemia, cardiomyopathy with systolic heart failure and a dilated left ventricle.  (R. 989).  On August 30, 2018, she complained to cardiologist Mark J. Decaro, M.D., of Jefferson Health of shortness of breath with exertion and sharp chest pains upon both rest and exertion.  (*Id.*). Plaintiff underwent a cardiac catherization that showed nonobstructive coronary artery disease.  (R. 990).  Continued shortness of breath and one recent episode of sharp chest pain

was noted at a September 12, 2018 visit with Dr. Decaro.  (*Id.*).  Dr. Decaro observed that

Plaintiff was not experiencing any lower extremity swelling at the visit, although at the

subsequent October 3, 2018 visit Plaintiff reported ankle edema, which was worst at the end

of the day.  (R. 992).

      **B.**     **Non-Medical Evidence**

On April 8, 2007, Plaintiff completed an Adult Function Report.  (R. 243-53).  She

indicated that she could not walk or sit for more than 30 to 40 minutes or stand or bend for "long

periods," that when reaching or stretching her back hurts due to a pulled muscle, and that back

pain and thigh numbness and cramps interfere with her sleep.  (R. 243-44, 248).  She further

stated that all her joints are stiff and painful.  (R. 243).  She explained that she generally spends

all day watching television, although she sometimes also reads, prepares simple meals, cleans,

washes dishes, and goes shopping with her daughter for three to four hours.  (R. 244, 246).

Plaintiff asserted that she can no longer play with, run after or lift up her 30-pound grandchild or

grandchildren.  (R. 244, 248).  She also claimed to have difficulty engaging in personal care due

to arm and hand cramping and difficulty lifting her legs.  (*Id.*).  She reported being able to walk,

ride in a car, use public transportation and go out alone, although she does not "like to or want

to."  (R. 246).  She stated that she goes unaccompanied to doctor's appointments "very often"

and to church three times per week for two-and-a-half to four hours at a time.  (R. 247).  Plaintiff

checked boxes indicating difficulties with lifting, squatting, bending, standing, reaching,

walking, sitting, kneeling, stair climbing, completing tasks, concentrating and using her hands.

(R. 248).  She noted that a physician had suggested using a cane but that she did not do so.  (R.

249).  She asserted that she can pay attention for one to two hours.  (R. 248).

In an attached Supplemental Function Questionnaire, Plaintiff explained that she began

having pain primarily in her knees, legs, feet and sometimes back, spreading to her upper thighs, hands, and fingers, in January 2008 due to repeatedly slipping and falling on wet and icy floors at her job.  (R. 251).  She described the pain as "excruciating" during the winter, "extreme" but fluctuating in intensity, lasting for two to three hours for three to four times per day, and brought on by bending, standing, walking, squatting, sitting, pulling and cold temperatures.  (*Id.*).  She described taking hot showers, using Bengay or an Icy Hot pad, and attending physical therapy, but not using any braces, to alleviate the pain.  Lastly, she reported that her medications make her drowsy.  (*Id.*).

On approximately the same date, Plaintiff's daughter, Ivana Santiago, completed a Third Party Adult Function Report.  (R. 304-312).  Ms. Santiago claimed that Plaintiff cannot stand, sit or bend down without pain and that she has consistent numbness, cramping, and stiffness throughout her body, as well as consistent pain in her legs, back, knees, arms, and feet.  (R. 305, 312).  She asserted that Plaintiff mostly watches television all day and that her impairments affect her ability to engage in personal care.  (R. 306).  However, she stated that Plaintiff also reads the Bible three times per day, washes dishes and does laundry, shops online, sometimes shops in stores for 30 minutes and cooks, attends church thrice weekly for up to four hours each time, and can use public transportation alone to go to doctor appointments.  (R. 307-09).  Ms. Santiago checked boxes indicating that Plaintiff has difficulties with lifting more than 30 pounds, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, remembering, completing tasks, concentrating and using her hands.  (R. 310).  She explained that Plaintiff can walk for 15 to 20 minutes before requiring a break and that she can pay attention for one hour.  (*Id.*).

At the October 24, 2018 administrative hearing, Plaintiff testified that she is five feet

eight inches tall and weighs 306 pounds.  (R. 47).  She denied having a driver's license and instead uses public transportation, Uber and Lyft.  (R. 48).  She stated that she last worked at a Dunkin' Donuts in 2017 but quit after a dispute with a customer and because it was too stressful.  (R. 50-51).  She also testified to being in pain while working and frequently tripping.  (R. 50-52).  She asserted that she has pain, numbness, tingling and swelling in her feet, and especially her left ankle, stemming from flat feet.  (R. 51).  Plaintiff indicated that she has "snapping" in and trouble bending her knees, especially the left one, and that for the last month she had been wearing a knee brace on her left knee to stand or walk for a significant period.  (R. 53).  She complained of sharp, pinching pain in her lower back, especially on the right side, if she stands for more than 15 to 20 minutes.  (R. 54).  Later, she testified that she is limited to standing for 30 to 40 minutes and walking one and a half blocks, primarily due to the problems with her knees and feet.  (R. 55).  She explained that she can hold her 20- to 22-pound granddaughter for 10 to 15 minutes, but it leaves her back "really hurting."  (*Id.*).  However, she stated that she could comfortably lift up to 20 pounds.  (*Id.*).  Plaintiff claimed to have difficulty washing dishes, sweeping the floor and shopping, although she also reported engaging in the latter activity with her daughter for up to two hours.  (R. 56).  She testified that she goes up and down the stairs in her home with difficulty but approximately five to seven times per day; however, she does not go to the basement because the stairs are very narrow and there is no railing.  (R. 58).  Finally, she stated that she tried physical therapy for "a short time," as well as home exercises that she ceased due to pain, but her physical condition worsened nonetheless.  (R. 60).

### III.   ALJ'S DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the

following findings:

1.     The claimant meets the insured status requirements of the Social Security Act

       through September 30, 2020.

2.     The claimant has not engaged in substantial gainful activity since September 5,

       2017, the amended alleged onset date.

3.     The claimant has the following severe impairments: major depressive disorder,

       post-traumatic stress disorder (PTSD), generalized anxiety disorder, obesity,

       degenerative disc disease of the lumbar spine, flat feet, rheumatoid arthritis,

       obstructive sleep apnea, hypertension, and cardiomyapthy.

4.     The claimant does not have an impairment or combination of impairments that

       meets or medically equals the severity of one of the listed impairments in 20 CFR

       Part 404, Subpart P, Appendix 1.

5.     After careful consideration of the entire record, I find that the claimant has the

       residual functional capacity to perform light work as defined in 20 C.F.R.

       404.1567(b) and 416.967(b) except she is limited to standing/walking no more

       than 4 hours in an 8-hour workday; to being able to shift positions from sitting to

       standing at will; to being able to shift positions from sitting to standing at will; to

       no more than occasional overhead reaching; to no climbing ladders, ropes or

       scaffolds, kneeling, crawling, balancing, or walking on uneven surfaces, and only

       occasionally performing all other postural maneuvers; to no exposure to hazards

       such as unprotected heights or dangerous machinery; and to no more than

       occasional exposure to extreme temperatures or vibration.  She can perform

       routine, repetitive tasks and make only simple work-related decisions based on

established standards and instructions.  She is able to work in proximity with others, but with no more than occasional tandem or teamwork with coworkers on the same tasks and she is limited to occupations where there are few and infrequent changes in the work setting or the tasks performed.  (R. 25).

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born on September 6, 1967 and was 48 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 20, 2015, through the date of this decision.

(R. 20-33).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 33).


IV.    **LEGAL STANDARD**

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which

13

has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §

1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If she is not, then the
> Commissioner considers in the second step whether the claimant has
> a "severe impairment" that significantly limits her physical or
> mental ability to perform basic work activities.  If the claimant
> suffers a severe impairment, the third inquiry is whether, based on
> the medical evidence, the impairment meets the criteria of the
> impairment listed in the "listing of impairments," . . . which result
> in a presumption of disability, or whether the claimant retains the
> capacity to work.  If the impairment does not meet the criteria for a
> listed impairment, then the Commissioner assesses in the fourth step
> whether, despite the severe impairment, the claimant has the
> residual functional capacity to perform her past work.  If the
> claimant cannot perform her past work, then the final step is to
> determine whether there is other work in the national economy that
> the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four.

If the claimant is determined to be unable to resume previous employment, the burden shifts to

the Commissioner at step five to establish that, given the claimant's age, education, work

experience, and mental and physical limitations, he is able to perform substantial gainful

activities in jobs existing in the national economy.  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88,

92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is

bound by the factual findings of the Commissioner if they are supported by substantial evidence

and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.

1999).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a

reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118

(3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the

decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

**V.   DISCUSSION**

In her request for review, Plaintiff raises a single claim: "The ALJ erred by failing to evaluate the medical opinion evidence in accordance with the regulations, Agency policy, and Third Circuit precedent."  (Pl.'s Br., ECF No. 10, at 2).  Specifically, she asserts: "The ALJ did not reasonably or logically reject Dr. Okamoto's opinion to prefer the non-examining consultant's, whose opinion was offered over a year before Plaintiff's onset date and before she was diagnosed with additional impairments."  (*Id*. at 13).  The Acting Commissioner responds that substantial evidence supports the ALJ's evaluation of Dr. Okamoto's opinion.  (Resp., ECF No. 11, at 6).  I agree with the Acting Commissioner.

Plaintiff observes that the ALJ rejected the disabling restrictions determined by Dr. Okamoto regarding her likely monthly absences, her need for multiple extended breaks during the workday and her ability to stand, walk, lift, and carry.  (Pl.'s Br., ECF No. 10, at 12-13).  She contends that this rejection was in error because the ALJ failed to appropriately consider Dr. Okamoto's and Dr. Walker's opinions pursuant to 20 C.F.R. § 404.1527(c), applicable to SSDI claims (like Plaintiff's) filed prior to March 27, 2017.  (*Id.* at 13-14).  Plaintiff notes that under this regulation (and 20 C.F.R. § 416.927(c), for Plaintiff's SSI claim), an examining source's medical opinion is generally entitled to more weight than a non-examining source's opinion and a treating source's medical opinion is generally entitled to more weight than a non-treating source's opinion if the treating source has reasonable knowledge of the claimant's impairments.

(*Id.* (citing 20 C.F.R. § 404.1527(c)(1), (2)(ii); *see also* 20 C.F.R. § 416.927(c)(1), (2)(ii))). However, as the Acting Commissioner responds, a treating source's opinion is only entitled to *controlling* weight if it is both: "(1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and (2) not inconsistent with the other substantial evidence in the record." (Resp., ECF No. 11, at 6 (citing 20 C.F.R. §§ 404.1527(c)(2)(ii), 416.927(c)(2))). If these factors are not present, "then the ALJ is free to give that opinion less than controlling weight or even reject it, so long as the ALJ clearly explains her reasons and makes a clear record." *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 148 (3d Cir. 2007) (citing *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991)); *see also Irey v. Colvin*, No. 13-7423, 2016 WL 337019, at *4 (E.D. Pa. Jan. 27, 2016) ("the ALJ is not bound by the opinion of any one physician, and can reject an opinion if there is a lack of support or a finding of contradictory evidence in the record") (citation omitted). In such cases, the treating source's opinion "is evaluated and weighed under the same standards applied to all other medical opinions, taking into account numerous factors including the opinion's supportability, consistency and specialization." *Id.* (citation omitted).

Pursuant to this framework, the initial question is whether Dr. Okamoto's opinion is: (1) well-supported by medically acceptable evidence, and (2) not inconsistent with other substantial evidence. *See* 20 C.F.R. §§ 404.1527(c)(2)(ii), 416.927(c)(2). The ALJ found that the opinion was inconsistent with Dr. Okamoto's own treatment notes and other objective medical evidence, and, therefore, much of the parties' briefing centers on this second requirement.[4] (R. 30; Pl.'s Br., ECF No. 10, at 16-18; Resp., ECF No. 11, at 10-14, 15-16).

---

[4] As discussed below, "consistency" is also one of the factors that the ALJ must consider in assessing the relative weight of a medical opinion not accorded controlling weight. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).

According to Plaintiff, no evidentiary support exists for the ALJ's determination that Dr. Okamoto's opinion is not consistent with her notes and other evidence. (Pl.'s Br., ECF No. 10, at 16). In making this assertion, she cites substantial evidence tending to undermine the ALJ's determination that Dr. Okamoto's opinion is inconsistent with the rest of the record, including evidence reflecting her osteoarthritis in her knees, her degenerative disc disease in her lumbar spine, her morbid obesity, her ankle weakness for which she was prescribed a brace, her antalgic gait, her steroid injections and physical therapy, her "crippled" status per the Oswestry test, and her physical therapy notes and testimony reflecting limitations in sitting, standing, walking and stairclimbing. (*Id.* at 16-17 (citing R. 55, 407, 510-11, 514-15, 697, 785-86, 788-89, 809, 811, 846, 876, 944)).

However, the Acting Commissioner counters with substantial evidence supporting the ALJ's determination. This evidence includes Dr. Okamoto's treatment notes reflecting normal musculoskeletal examinations, the fact that Plaintiff generally visited Dr. Okamoto for ailments unrelated to her impairments and the absence in the notes of any indication that Plaintiff's pain affected her ability to sit, walk, stand, or concentrate. (Resp., ECF No. 11, at 10-11 (citing R. 753-73)). In addition, the Acting Commissioner cites the findings and opinions of other medical sources indicating that Plaintiff was less limited than determined by Dr. Okamoto, including Dr. Walker's administrative findings that Plaintiff could lift and carry more and stand, walk, and sit longer than ultimately determined by Dr. Okamoto; Dr. Lowman's physical examination results showing normal gait, station, and psychiatric results; emergency room records showing that Plaintiff had normal range of motion and gait and not indicating any pain-induced deficits in her ability to concentrate, walk, stand, or sit; Dr. Park's treatment notes indicating no such deficits but instead stating that Plaintiff's arthritis appeared "well controlled" with orthopedic injections

and medications, that she had declined or deferred other treatments, and that physical examination results were generally normal; and Ms. Blakely's treatment notes reflecting full strength in Plaintiff's legs, with no current symptoms or diminished ability to concentrate, walk, stand, or sit.  (Resp., ECF No. 11, at 11-14 (citing R. 83-84, 99-100, 105, 399-400, 404-05, 409, 454, 584, 712-42, 790-91, 805-81)).

Plaintiff takes issue with some of this evidence, arguing that Dr. Walker's non-examining opinion was authored more than a year prior to Plaintiff's amended onset date when Dr. Walker lacked access to approximately 500 pages of additional medical records reflecting new diagnoses for congestive heart failure and knee osteoarthritis, a prescription for an ankle brace due to ankle weakness, and a heart catheterization, and including Dr. Okamoto's opinion, the specialists' treatment notes, and additional imaging.  (Pl.'s Br., ECF No. 10, at 15 (citing SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996))).  However, Plaintiff ignores the ALJ's discussion of this later-generated evidence, much of which is summarized in the preceding paragraph, and which the ALJ found to be consistent with Dr. Walker's assessment but inconsistent with Dr. Okamoto's. (*See* R. 27-30 (discussing, *inter alia*, records of Dr. Park and Dr. Ogilby and from Plaintiff's emergency room visit and noting that Dr. Okamoto's opinion was not consistent with the objective medical evidence in the record)).  The ALJ's decision to credit Dr. Walker's findings over Dr. Okamoto's was not error on the basis that Dr. Walker lacked access to additional records tending to support her findings and further refute those of Dr. Walker.[5]  *Salerno v. Comm'r of Soc. Sec.*, 152 F. App'x 208, 209-10 (3d Cir. 2005) (affirming district court opinion

---

[5]  The fact that the later-generated evidence tended to support rather than contradict Dr. Walker's opinion distinguishes this case from *Nazario v. Comm'r Soc. Sec.*, 794 F. App'x 204 (3d Cir. 2019), cited by Plaintiff.  In that case, the evidence generated after the non-treating, non-examining sources' reports tended to contradict their conclusions that the claimant did not suffer from disabling limitations.  *Id.* at 206, 210.

upholding ALJ decision crediting opinion of non-examining source over that of a treating source because "it was more consistent with the objective medical findings"); *Starks v. Colvin*, No. CV 16-6062, 2017 WL 4053755, at *3 (E.D. Pa. Sept. 12, 2017) ("An ALJ may choose to accept the opinion of a non-treating, non-examining physician over the opinion of a treating physician so long as she does not disregard the findings of the treating physician's opinion and there is medical evidence in the record contradicting the treating physician's opinion.") (quoting *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011)).

Plaintiff additionally takes issue with the ALJ's reference to Dr. Okamoto's "unremarkable musculoskeletal findings" during Plaintiff's visit for a cold in May 2018, also noted above, accusing the ALJ of "cherry-picking" this evidence from a mere "'visual overview' of her extremities during an appointment focused on another condition" while failing to mention her Oswestry score translating to a designation of "crippled." (Pl.'s Br., ECF No. 10, at 17). But there are multiple problems with Plaintiff's arguments. First, the ALJ can hardly be said to have cherry-picked the results of this one examination when all four visits with Dr. Okamoto showed similar musculoskeletal findings. (R. 755, 762, 766, 769, 773). Second, insofar as Plaintiff suggests that Dr. Okamoto's musculoskeletal findings should be disregarded because Plaintiff was treating for generally unrelated conditions, such as abdominal pain, hypertension, and a cold, the same reasoning could be applied to the limitations set forth in Dr. Okamoto's opinion because these limitations were unrelated to the conditions for which Plaintiff primarily sought treatment from Dr. Okamoto. Third, the fact that the ALJ did not specifically reference Plaintiff's "crippled" status under the Oswestry test is immaterial because an ALJ need not discuss "every tidbit of evidence included in the record," *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004), and, in any event, the ultimate issue of whether

Plaintiff is disabled is reserved to the Commissioner.  *See Smith v. Comm'r of Soc. Sec.*, 178 F. App'x 106, 112 (3d Cir. 2006).

In short, although Plaintiff cites substantial evidence that might have supported the acceptance in full of Dr. Okamoto's opinion, and thus a finding of disabling limitations, this fact is not a basis for remand.  Because substantial evidence also supports the ALJ's determination that Dr. Okamoto's opinion was inconsistent with much of the remaining record, the ALJ was permitted to accord that opinion less than controlling weight.  *See Simmonds*, 807 F.2d at 58 ("While there is other evidence in the record that could support a finding of disability . . . , our inquiry is not whether the ALJ could have reasonably made a different finding based on this record.  Rather, we must review whether the ALJ's actual findings are supported by substantial record evidence."); *see also Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (a treating source's opinion must only be accorded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record") (citation and internal brackets omitted).

As Plaintiff observes, however, this does not conclude the evaluation of Dr. Okamoto's opinion.  (Pl.'s Br., ECF No. 10, at 18-19).  Even where a treating source's medical opinion is not accorded controlling weight, the ALJ must determine what, if any, weight is warranted based upon consideration of several factors: the treatment relationship between the source and the claimant including the length of treatment and frequency of examination and the nature and extent of the treatment relationship; the supportability of the opinion; its consistency; the treating source's specialization, if any; and any relevant "other factors."  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

Regarding the first factor listed above, Plaintiff complains that the ALJ "gave no obvious

consideration" to the fact that Dr. Okamoto treated and examined Plaintiff "several times" over the course of four months before providing her opinion. (Pl.'s Br., ECF No. 10, at 14-15). She claims that the ALJ's rejection of Dr. Okamoto's opinion partially because of her treatment of Plaintiff only "for a short time" is nonsensical in light of the greater weight accorded the opinion of Dr. Walker, who never treated or examined Plaintiff. (*Id.* at 14). As an initial matter, Plaintiff's characterization of the length and frequency of her treatment with Dr. Okamoto is not entirely accurate. Plaintiff treated with Dr. Okamoto only four times over approximately two-and-a-half months, and the ALJ's decision specifically referenced three of the four visits. (R. 28, 753-73). The Third Circuit Court of Appeals has found significantly longer periods insufficient to warrant crediting a treating source's opinion. *See, e.g., Lee v. Comm'r Soc. Sec.*, 248 F. App'x 458, 461 (3d Cir. 2007) (concluding "that the ALJ appropriately discounted [a treating source's] opinion," in part because the "treatment was limited in time" to 14 months); *see also* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). Nor was the ALJ required to accord Dr. Okamoto's opinion greater weigh than Dr. Walker's because the former treated and examined her and the latter did not, as discussed above. *See Salerno*, 152 F. App'x at 209-10; *Starks*, 2017 WL 4053755, at *3. This is particularly true where, as here, the ALJ found that Dr. Okamoto only treated Plaintiff "for a short time." *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) (a treating source's opinion is accorded greater weight "*[w]hen the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment*") (emphasis added).

Regarding supportability, the regulations provide that a medical opinion will be given more weight "[t]he better an explanation a source provides for [the] medical opinion" and "[t]he more a medical source presents relevant evidence to support [the] medical opinion, particularly medical signs and laboratory findings . . . ."  20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).  Here, the Acting Commissioner contends that Dr. Okamoto's medical opinion was provided on a preprinted "checkbox" form without substantial explanations for the limitations determined by her.  (Resp., ECF No. 11, at 9-10).  A review of the opinion shows that the Acting Commissioner's characterization is largely accurate.  In recording Plaintiff's limitations, Dr. Okamoto merely checked columns next to various abilities indicating Plaintiff's functionality in each area.  (R. 696-99).  In support of each overall category of functionality (i.e., lifting/carrying, sitting/standing/walking, use of hands/feet, postural activities, environmental limitations), Dr. Okamoto generally made only vague references to the record rather than provide any explanation or narrative.  (*See* R. 696-98 ("x ray with degen back disease, MRI result pending"; "x ray spine, clinical history, visits to rheum & orthopedics"; "see PT report"; "see specialist notes"; "would be difficult to be seated"; "based on exam & history")).  This failure to explain the bases for Plaintiff's purported limitations is significant because it "by itself would justify the ALJ's decision to accord [the opinion] little weight." *Cunningham v. Comm'r of Soc. Sec.*, 507 F. App'x 111, 119 (3d Cir. 2012); *see also Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.").

The next factor, consistency, has largely been addressed already in the context of whether to accord Dr. Okamoto's opinion controlling weight.  As noted there, substantial evidence supports the ALJ's finding that Dr. Okamoto's opinion was inconsistent with much of the record,

including multiple treating and/or examining providers' findings that Plaintiff had a normal gait and physical examination results and not mentioning any pain-induced deficits in her ability to concentrate, walk, stand, or sit.  (R. 83-84, 99-100, 105, 399-400, 404-05, 409, 454, 584, 712-42, 790-91, 805-81).  In addition to Plaintiff's challenges to this evidence, addressed above, she also argues that the ALJ improperly treated her "increased pain after doing housework and . . . exercis[e] on a bike at the YMCA" as inconsistent with the severity of her reported symptoms.  (Pl.'s Br., ECF No. 10, at 16).  In fact, all that the ALJ wrote on this point was: "Of note, the claimant told her physical therapist on June 13, 2018 that she had increased pain because she did 'a bunch of housework' the previous day and on July 16, 2018, the claimant reported that she recently joined the YMCA and was exercising on a bike with upper extremity attachments for 30 minutes at a time." (R. 29).  The ALJ made no further reference to this evidence, including when she listed her reasons for according Dr. Okamoto's opinion little weight.  (R. 30).  Plaintiff posits that the ALJ "plainly drew" an "inference" that Plaintiff's performance of housework "equated to the performance of light exertional work 8 hours a day," but the ALJ's lone discussion of the physical therapy notes regarding the housework and exercise bike appears to have been by way of summary only.  (Pl.'s Br., ECF No. 10, at 16).

In any event, to the extent that the ALJ did view this evidence as inconsistent with Dr. Okamoto's opinion (despite not identifying it as such), she had other bases to discount the opinion (i.e., those actually listed in the decision), including Dr. Okamoto's contemporaneous treatment notes, the other medical evidence noted in this paragraph and above, and Plaintiff's oral testimony at the administrative hearing.  (R. 30).  Moreover, insofar as Plaintiff's ability to do housework and exercise on a recumbent bike factored into the ALJ's decision, it was not error for the ALJ to consider these activities of daily living, notwithstanding the pain they caused

Plaintiff.  *See Harkins v. Comm'r of Soc. Sec.*, No. 20-1728, 2022 WL 409490, at *1 n.1 (W.D. Pa. Feb. 10, 2022) ("a plaintiff need not be entirely pain free or experiencing no discomfort at all in order to be found not disabled under the Act") (citing *Andreolli v. Comm'r of Soc. Sec.*, No. 07-1632, 2008 WL 5210682, at *4 (W.D. Pa. Dec. 11, 2008); *see also* 20 C.F.R. §§ 416.945(a)(1), 404.1545(a)(1) (RFC  is defined as the most an individual can still do despite her limitations)).

       As to the last factor,[6] specialization, Plaintiff points out that the ALJ did not "acknowledge or discuss Dr. Okamoto's specialty as a board-certified physician."  (Pl.'s Br., ECF No. 10, at 14).   However, she neglects to mention that Dr. Okamoto's specialty is in internal medicine, with a subspecialty in general internal medicine.  *See* Dr. Emi E. Okamoto, M.D., U.S. News and World Report Profile, *available at* https://health.usnews.com/doctors/emi-okamoto-1166318 (last visited October 26, 2022).  Plaintiff observes that the regulations provide that more weight is normally given to specialists' opinions "about medical issues related to his or her area of specialty," but she fails to explain how the limitations in Dr. Okamoto's opinion stemming primarily from Plaintiff's degenerative disc disease and arthritis relate to her specialty in internal medicine.  20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).  As the Acting Commissioner observes, Dr. Okamoto is not a specialist "in orthopedics or rheumatology – areas that might be more relevant to Plaintiff's conditions and her functional abilities."  (Resp., ECF No. 11, at 10).

       Because I find no reversible error in the ALJ's evaluation of the medical opinions in this matter, I deny Plaintiff's request for review.

----

       [6]  As noted, the regulations also provide for the consideration of "other factors" brought to the ALJ's attention, but no such additional factors beyond those addressed herein are identified in the parties' briefs.  20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6).

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **DENIED**.  An appropriate Order follows.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge